*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: PLAVIX MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION (NO. II) | MDL No. 2418 |
| This Document Relates to:<br><br>UNITED STATES OF AMERICA, *et al.*, *ex rel.* JKJ Partnership 2011, LLP,<br><br>　　　Plaintiffs,<br><br>v.<br><br>SANOFI AVENTIS, U.S., LLC, *et al.*,<br><br>　　　Defendants. | Civil Action No. 11-6476 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

Before the Court is the renewed motion of Defendants Sanofi-Aventis U.S., LLC ("Sanofi"); Sanofi US Services, Inc.; Aventis Pharmaceuticals, Inc.; Bristol-Myers Squibb Company ("Bristol Myers"); and Bristol-Myers Squibb Sanofi Pharmaceuticals Holding Partnership (collectively "Defendants"), to dismiss the Second Amended Complaint ("SAC") of Relator-Plaintiff JKJ Partnership 2011, LLP ("JKJ" or "Relator") for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6), and to strike Relator's discovery-supplemented allegations. For the reasons that follow, Defendants' motion to dismiss is **GRANTED**.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   Factual Background

On October 26, 2011, two doctors and a Sanofi sales representative formed JKJ, a Delaware

Limited Partnership.   JKJ was formed for the purpose of bringing the present litigation.   On

November 4, 2011 — nine days after it was formed — JKJ filed the original *qui tam* Complaint,

identifying its partners anonymously as "Partner A," "Partner B," and "Partner C."  Original

Compl., ¶¶ 20-24.   The partners were later identified as Dr. John Venditto, Kelly Evans, and Dr.

Jeffrey Stahl.   In the Original Complaint, JKJ alleged, *inter alia*, that

> the Sanofi Defendants failed to disclose material adverse efficacy
> data regarding Plavix®, as required by 21 C.F.R. § 314.80
> (governing post-marketing reporting of adverse drug experiences),
> causing physicians to prescribe, and Government Programs to
> reimburse, Plavix® for millions of patients who were genetically
> predisposed to experience diminished or no responsiveness to
> Plavix®, rendering it little more than a placebo and placing the
> patients at significant risk.

*Id.* at ¶ 5.  Plavix® (clopidogrel bisulfate) ("Plavix") is a prescription antiplatelet drug ("blood

thinner") manufactured by Bristol Myers and comarketed in the United States by Sanofi.  SAC, ¶¶

125-126.  Approved by the United States Food and Drug Administration ("FDA") in November

1997, Plavix is indicated for the treatment of Acute Coronary Syndrome and for use following a

recent myocardial infarction or stroke or established peripheral artery disease.  *Id.* at ¶ 125.

Defendants marketed and sold Plavix in the United States from March 1998 until May 2012, when

Plavix's patent expired.  *Id.* at ¶ 126.  During that time, Relator alleges that Plavix was among the

top-selling drugs in the United States, and it was the dominant antiplatelet drug.  *Id.* at ¶¶ 125-27.

On February 22, 2017, JKJ filed the SAC, further supporting its claim of Plavix's

ineffectiveness for certain patients based on their genetic makeup.  In the SAC, JKJ alleges that

> Defendants promoted [Plavix] as *the* standard of care for *all*
> antiplatelet and antithrombotic patients—including patients who

2

> received stents—notwithstanding their knowledge that the drug had
> little or no effect, and was therefore medically contraindicated, for
> over 30% of patients. . . . Defendants knew, but concealed the fact
> that their blockbuster drug Plavix had no demonstrable
> pharmacodynamics effect for many patients who had been
> prescribed the drug. They also knew that these "non-responders" or
> "low responders" were not entirely genetically random. Individuals
> whose ethnic background was African-American or Asian-
> American had a much higher risk of non-response to Plavix than
> other ethnicities. . . . Defendants referred to this as the Plavix
> "Variability of Response" (or "VOR") issue.

*Id.* at ¶¶ 1-2 (emphasis in original).  Relator further alleges that beginning in 1998, Defendants

knew that over 30% of patients had little or no response to Plavix (*i.e.*, "non-responders").  *Id.* at

¶¶ 1-2, 131.  Relator specifically claims that while Defendants knew that certain ethnic groups,

such as African Americans and Asian Americans, were more likely to be non-responders, they

actively concealed this information from healthcare providers, government payors and purchasers,

and the FDA to avoid curbing profits from the sale of the drug.  *Id.* at ¶¶ 2, 272, 274.  In the years

to follow, Relator alleges that medical researchers, including Dr. Paul A. Gurbel, discovered that

"Plavix was essentially a placebo and medically unnecessary" for certain patients.  *Id.* at ¶¶ 2, 131-

32.  Indeed, the SAC alleges that Dr. Gurbel "communicated regularly with Defendants about

clopidogrel resistance in the late 1990s and early 2000s," and he received a grant from Defendants

in the late 1990s to conduct the first prospective study of the antiplatelet effects of Plavix in

patients undergoing stenting.  *Id.* at ¶ 134.  According to Relator, the so-called PRONTO study,

revealed "the lack of response (defined as <10% inhibition of platelet aggregation) in over 30% of

the patients studied."  *Id.*

Furthermore, Relator alleges that in 2009, Dr. Gurbel as senior author, along with principal

investigator Alan R. Shuldiner, M.D., and others, co-authored a study that "conclusively identified

a common variant of the CYP2C19 gene as a major factor for clopidogrel non-responders and low-

3

responders." *Id.* at ¶ 143.  Put simply, according to Relator, patients' variability of response to Plavix was associated with a genetic mutation on the CYP2C19 enzyme – a genetic mutation that was more common in African Americans and Asian patients.[1]  *Id.*

Purportedly, in response to Dr. Gurbel's findings, and other independent studies conducted on the topic, Defendants added information about these CYP2C19 poor metabolizers to the Plavix label in May 2009.  *Id.* ¶ 194.  Specifically, the label "expressly addressed the fact that, due to polymorphisms in the CYP2C19 enzyme, not all patients taking Plavix will have adequate platelet inhibition."  *Id.*  Relator also alleges that later in 2009, the FDA required Defendants add a "WARNINGS" section to the Plavix label, describing the potential for reduced effectiveness of the drug due to impaired CYP2C19 function.  *Id.* at ¶ 195.  One year later, in March 2010, the FDA moved the information about CYP2C19 poor metabolizers to a boxed warning.  *Id.* at ¶ 196.

Relator claims that Defendants made affirmative misrepresentations by "systematically and deliberately promot[ing] Plavix through false and misleading advertising [and other marketing materials] that overstated efficacy, and minimized critical adverse event and risk information. Relator alleges that Defendants branded this as their 'Expand and Protect' strategy." *Id.* at ¶ 249. Indeed, Relator avers that Defendants created a logo used on Sales and Marketing material to stress and reflect this strategy.  *Id.*  According to Relator, based upon such a strategy, Defendants "protected" Plavix by selling the drug's safety and efficacy in all patients in spite of the fact that

---

[1]      The SAC omits allegations included in Relator's Original Complaint and First Amended Complaint related to Defendants' purported promotion of Plavix for off-label uses that were not the accepted standard of care, including patients who had received a coronary artery bypass graft and diabetes.  Similarly, the SAC also does not include allegations related to a claimed fraudulent kickback scheme involving Sanofi related to Hyalgan, an osteoarthritis drug.  In that regard, the Court notes that while the Original Complaint and First Amended Complaint included claims and allegations involving three products marketed by Sanofi, including Plavix, Hyalgan, and the prostate cancer drug Eligard, the SAC includes claims related only to Plavix.

Defendants knew it was false. *Id.* Defendants purportedly directly contracted with government purchasers, expressly and impliedly warranting that Plavix was suitable to treat government purchasers' beneficiaries, even though Defendants knew that Plavix was not suitable for a substantial portion of those beneficiaries. *Id.* at ¶¶ 305-08.

**B.**   **Procedural History**

As stated above, the Original Complaint was filed on November 4, 2011, by JKJ, which, at the time, consisted of Dr. John Venditto, Kelly Evans, and Dr. Jeffrey Stahl. Thereafter, the SAC was filed on February 22, 2017. The SAC asserts five counts, alleging violations of four sections of the FCA, 31 U.S.C. § 3729(a)(1)(A), (B), (C), and (G), and their state law analogues. SAC, ¶¶ 390-405. Relator alleges that: (1) Defendants submitted, or caused to be submitted, factually false claims to the Government by concealing that Plavix was defective for over thirty percent of patients; (2) Defendants' false statements or records caused healthcare providers to falsely certify (either expressly or impliedly) to government programs that Plavix was reasonable and medically necessary for non-responders, and therefore, eligible for reimbursement; (3) Defendants' false statements or records caused healthcare providers to falsely certify (either expressly or impliedly) to government programs that prescriptions for Plavix were reimbursable, even though Defendants' misrepresentations and inadequate instructions for use rendered Plavix misbranded and not FDA-approved (and therefore ineligible for reimbursement); (4) Defendants fraudulently induced government contracts by misrepresenting Plavix as effective for all patients for its approved uses and then sought payment under those contracts; and (5) Defendants knowingly concealed an obligation to pay the Government that arose out of Defendants' violations of existing corporate integrity agreements.

At some point between the filing of the Original Complaint and the filing of the SAC, however, Dr. Venditto withdrew from the JKJ partnership, and Dr. Gurbel joined the JKJ partnership to replace him.  After the substitution in membership came to light, the Court, at an August 9, 2017 status conference, asked the parties to brief whether JKJ was a proper relator capable of continuing the litigation. In response to the Court's inquiry, on October 11, 2017, Defendants filed a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6).  In part, Defendants invoked the False Claims Act's first-to-file bar.  31 U.S.C. § 3730(b)(5); *see United States ex rel. JKJ P'ship 2011, LLP v. Sanofi Aventis, U.S., LLC* (*In re Plavix Mktg., Sales Practices & Prods. Liab. Litig. (No. II)*), 315 F. Supp. 3d 817, 821–22 (D.N.J. 2018) (*In re Plavix I*).  Defendants' position was that the partnership containing Dr. Gurbel ("New JKJ") was a different legal entity from the partnership containing Dr. Venditto ("Former JKJ"), so New JKJ's effort to pursue the suit as the relator amounted to an "interven[tion]" banned by the first-to-file bar. *See In re Plavix I*, 315 F. Supp. 3d at 830.  On May 30, 2018, this Court granted Defendants' motion, concluding that Former JKJ and New JKJ were distinct legal entities under Delaware law. *Id.* at 830–34.  Because I found the two entities to be legally distinct and separate, I held that New JKJ's presence violated the first-to-file bar.  I did not consider any other potential procedural deficiencies based on the change in Relator's identity. *Id.* at 834–35.

JKJ appealed this Court's decision to the Third Circuit, which certified three questions to the Delaware Supreme Court. *United States v. Sanofi-Aventis U.S. LLC*, No. 18-2472, 2019 WL 10271190, at *1 (3d Cir. June 12, 2019).  The Delaware Supreme Court, in turn, agreed with this Court that, as an aggregate partnership,[2] Former JKJ and New JKJ were distinct partnerships.

---

[2]      As expanded upon by the Delaware Supreme Court, "[u]nder the aggregate theory, 'a partnership is an aggregate of individuals and does not constitute a separate legal entity.'" Thus, "[t]he partnership has no legal existence apart from its members and cannot sue or be sued in the

Further, the Delaware Court explained that Former JKJ could not continue to prosecute the litigation as part of the winding-up process; however, the Court did not answer whether Former JKJ survived the replacement of Dr. Venditto, so that it could file the SAC, as that issue was before the Third Circuit at the time.[3] *United States ex rel. JKJ P'ship 2011 LLP v. Sanofi-Aventis U.S. LLC*, 226 A.3d 1117, 1123, 1135-36 (Del. 2020) (*In re Plavix II*).

Upon resolution of those state-law issues, the Third Circuit then found that this Court erred in finding that the FCA's first-to-file rule barred JKJ from amending its *qui tam* complaint to add, remove, or swap relators. *In re: Plavix Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 974 F.3d 228, 233-35 (3d Cir. 2020). Accordingly, the Third Circuit remanded the case to this Court for further proceedings. Although the Third Circuit held that New JKJ could take part in this litigation without violating the first-to-file rule, the court nonetheless questioned whether New JKJ could take part in this litigation "as a matter of partnership law and ordinary civil procedure." *Id.* at 235. The Third Circuit noted that deciding whether New JKJ is properly a relator "depends on record materials and recent developments that the District Court never had the chance to consider." *Id.* at 236. As a result, in declining to resolve this procedural issue, the circuit court posed three "lingering questions" for my consideration on remand: (1) whether the SAC's allegations are so different from those in the original Complaint that it exceeds the bounds of Fed. R. Civ. 15, (2) whether, as an aggregate partnership, either Former JKJ or New JKJ was a proper relator, and, if not, whether amendment should be permitted so that the partners can name themselves as the real parties in interest, and (3) whether Former JKJ or New JKJ owns this lawsuit. *Id.*

___

firm name." This is in contrast to the entity theory of partnership, where the partnership is "a legal person, *i.e.*, an entity separate from its constituent partners."

[3] The Delaware Supreme Court noted, however, that the Second Amended Complaint named the three partners as Dr. Stahl, Evans, and Dr. Gurbel, so the SAC must have been filed by New JKJ.

On March 31, 2021, Defendants filed the instant motion to dismiss the SAC and to strike Relator's discovery-supplemented allegations.  ECF No. 105.  In response, Relator filed opposition and the United States, who did not intervene in this action, submitted a statement of interest.  ECF Nos. 106 and 109.

## II.   <u>LEGAL STANDARD</u>

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted).  While Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  Thus, to survive a Rule 12(b)(6) motion to dismiss, the Complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While the "plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted).

To determine whether a plaintiff has met the facial plausibility standard mandated by *Twombly and Iqbal*, courts within the Third Circuit engage in a three-step progression. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the reviewing court "outline[s] the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court "peel[s] away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." *Id.* Finally, where "there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. This last step of the plausibility analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III.  DISCUSSION

"[T]he FCA makes it unlawful to knowingly submit a fraudulent claim to the government."[4] *U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 840 (3d Cir. 2014). "The primary purpose of the FCA is to indemnify the government-through its restitutionary penalty provisions-against losses caused by a defendant's fraud." *United States ex rel. Wilkins v.*

---

[4]     "Although Congress amended the False Claims Act in 2009 by enacting the Fraud Enforcement and Recovery Act ('FERA'), it did not substantially alter the provisions of the pre-FERA version of the False Claims Act." *U.S. ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89, 94 n.5 (3d Cir. 2018). The FCA, as FERA has amended it, now imposes liability on:

[A]ny person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]

31 U.S.C. § 3729(a)(1); *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 303 (3d Cir. 2011).

*United Health Grp., Inc.*, 659 F.3d 295, 304 (3d Cir. 2011) (quotation omitted).  To that end, the Act contains a *qui tam* provision that permits private parties (known as "relators") to bring suit "on behalf of the United States against anyone submitting a false claim to the Government." *Schumann*, 769 F.3d at 840 (internal quotation marks omitted) (quoting *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 941 (1997)).  If a *qui tam* suit is successful, the relator has the opportunity to share in the recovery.

The Third Circuit has recognized that "[t]here are two categories of false claims" that may form the basis of an FCA *qui tam* suit: (1) factually false claims; and (2) legally false claims. *Wilkins*, 659 F.3d at 305.  "'A claim is factually false when the claimant [knowingly] misrepresents what goods or services that it provided to the Government.' '[A] claim is legally false when the claimant knowingly falsely certifies that it has complied with' a material statute, regulation, or contractual provision.  Such certification may be express or implied.  'Under the 'express false certification' theory, [a claimant] is liable under the FCA for falsely certifying that it is in compliance with' a material statute, regulation, or contractual provision." *United States v. Eastwick Coll.*, 657 F. App'x 89, 93–94 (3d Cir. 2016) (quoting *Wilkins*, 659 F.3d at 305).  "By contrast, implied false certification liability attaches when a claimant 'makes specific representations about the goods or services provided' and the claimant's 'failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.'" *Id.* (quoting *Universal Health Servs., Inc. v. United States and Massachusetts, ex rel. Escobar*, 136 S.Ct. 1989, 2001 (2016)).[5]  "[T]he implied certification theory of liability should not be applied expansively, particularly when advanced on the basis of

---

[5]     "The FCA defines 'material' as 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'" *Wilkins*, 659 F.3d at 303 (quoting 31 U.S.C. § 3729(b)(4)).

FCA allegations arising from the Government's payment of claims under federally funded health care programs." *Wilkins*, 659 F.3d at 307. "Thus, under this theory a plaintiff must show that if the Government had been aware of the defendant's violations of the Medicare [or Medicaid] laws and regulations that are the bases of a plaintiff's FCA claims, it would not have paid the defendant's claims." *Id.*

In addition to factually false and legally false claims, the federal courts have recognized a narrow, third category of false claims -- contracts procured by "fraud-in-the-inducement." "[A] fraudulently induced contract may create liability under the False Claims Act when that contract later results in payment thereunder by the government, whether to the wrongdoer or someone else." *United States v. Veneziale*, 268 F.2d 504, 505 (3d Cir. 1959) (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) (superseded by statute); s*ee also U.S. ex rel. Thomas v. Siemens AG*, 593 F. App'x 139, 143 (3d Cir. 2014) ("Although the focus of the False Claims Act is on false 'claims,' courts have employed a fraudulent inducement theory to establish liability under the Act for each claim submitted to the government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves.").

In the SAC, Relator pursues its federal and state FCA claims under three theories of liability: (i) factual falsity, in that Defendants sought payment from government programs and purchasers of Plavix, (ii) express and implied false certification of compliance with conditions of payment, and (iii) fraud-in-the-inducement of government contracts for Plavix.

First, Relator contends that Defendants sought payment for Plavix from government purchasers and programs even though the drug was ineffective for over 30% of patients, contrary to Defendants' representations that it was suitable for all patients with a history of stroke, heart attack, or peripheral artery disease. SAC ¶¶ 2, 3-5, 130-31, 136-37, 140-41, 148-49, 274-85, 306-

11

07.  As a result, Relator submits that Defendants' claims for payment were factually false since they sought full payment for an inferior or defective antiplatelet drug, suitable only for a subset of patients, which was not the drug Defendants described or warranted.

Second, Relator alleges that the claims for Plavix payment or reimbursement were legally false because they misleadingly certified compliance with various statutes, regulations, or conditions required for payment under various government programs or contracts.  To this end, Relator alleges that because Plavix was ineffective for over 30% of patients, Plavix was not reasonable or medically necessary for those patients, as is required for Medicare and Medicaid reimbursement.  SAC ¶¶ 67, 71, 387.  As a result, it is Relator's position that reimbursement claims submitted to Medicare and Medicaid for non-responder patients were false because they were not payable under those programs.  SAC ¶¶ 67, 71, 77, 92, 378-82, 384, 388-389.  In addition, Relator underscores that both Medicaid and Medicare Part D exclude from coverage drugs that are not FDA approved.  SAC ¶¶ 68, 72, 378.  According to Relator, a drug is not FDA-approved if it fails to comply with ongoing regulatory requirements or is misbranded.  SAC ¶¶ 68, 72, 115-19, 378.  As to Plavix, Relator contends that Defendants failed to report adverse efficacy data or provide adequate instructions for use, and therefore, Plavix was not FDA-approved.  SAC ¶¶ 92, 96, 120-21, 379, 382, 388.  Moreover, Relator alleges that Plavix was misbranded because its labeling did not disclose that the drug was ineffective and that those non-responding patients could be identified through genetic or platelet function tests.  SAC ¶¶ 120-21, 183-98, 379, 382.

Third, relying explicitly on the fraud-in-the-inducement theory adopted by the Third Circuit in the unreported decision, *United States ex rel. Thomas v. Siemens AG*, 593 F. App'x 139, 143 (3d Cir. 2014), Relator contends that Defendants misrepresented and concealed Plavix's ineffectiveness, which fraudulently induced the Government to sign Plavix contracts, by

preventing government purchasers from making informed decisions.  SAC, ¶¶ 305-06, 308, 337, 339, 343, 350.  In this regard, Relator alleges that Defendants targeted government purchasers, recognizing that they were a significant portion of Plavix sales.  *Id.* at ¶¶ 324-25.  In addition, Relator contends that Defendants understood that these government purchasers, in awarding contracts and paying invoices, often rely on assurances and warranties, including those about drug quality.  *Id.* at ¶¶ 333, 335-36, 347-48.  According to Relator, Defendants knew that, if the medical community had known that over thirty percent of patients were non-responders, physicians would have prescribed alternative treatments.  *Id.* at ¶¶ 123, 128, 205.  Thus, relying on *In re Marsteller ex rel. United States v. Tilton*, 880 F.3d 1302, 1314-15 (11th Cir. 2018), *In re Baycol Prods. Litig.*, 732 F.3d 869, 876-77 (8th Cir. 2013), and *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173-75 (9th Cir. 2006), Relator claims that the SAC states a plausible claim that Defendants fraudulently induced government contracts for Plavix, such that claims under those contracts were false.

Defendants move to dismiss all of Relator's federal FCA claims and analog state law claims, in all three categories, on both procedural and substantive grounds.  At the outset, however, the Court must address Defendants' procedural arguments,[6] which are based on questions posed by the Third Circuit.  First, the Court will consider whether Former JKJ and New JKJ are proper relators, despite the Delaware Supreme Court's finding that as aggregate partnerships, neither Former JKJ nor New JKJ can sue or be sued in its own name.  Finding that they are, the Court will next address, whether New JKJ is a party to this action, such that the SAC is properly filed under

---

[6]    In the instant motion to dismiss, Defendants argue that the SAC should be dismissed (1) for failure to comply with Fed. R. Civ. P. 15; (2) because Relator, as an aggregate partnership under Delaware partnership law, cannot sue or be sued in the firm name; and (3) even if New JKJ is a proper relator, it does not own the litigation asset.

Fed. R. Civ. P. 15.  Finally, given my conclusion that New JKJ is not a party to this action, and therefore, it was not entitled to file the SAC, the Court will discuss the purported transfer of the litigation asset from Former JKJ to New JKJ in the context of substitution under Fed. R. Civ. P. 25.

### A.   <u>Whether Former JKJ or New JKJ Are Proper Relators</u>

The Third Circuit, emphasizing the Delaware Supreme Court's finding that an aggregate partnership cannot sue or be sued in its own name, asked this Court to consider whether either Former JKJ or New JKJ was a proper relator, and, if not, whether to allow amendment so that the partners can name themselves as the real relators in interest.  In this regard, Defendants contend that because New JKJ and Former JKJ are aggregate partnerships, they are not proper relators. Relator, on the other hand, argues that even if New JKJ and Former JKJ lack the capacity to sue or be sued under Delaware law, an exception to Fed. R. Civ. P. 17 permits this suit to enforce a substantive right under federal law.  I agree with Relator.

Rule 17(b) governs the capacity of parties to sue or be sued.  It provides:

> Capacity to sue or be sued is determined as follows:
>
> (1) for an individual who is not acting in a representative capacity, by the law of the individual's domicile;
>
> (2) for a corporation, by the law under which it was organized, and
>
> (3) for all other parties, <u>by the law of the state where the court is located</u>, except that:
>
> (A) a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right arising under the United States Constitution or laws; ...

Fed. R. Civ. P. 17(b) (emphasis added).  Thus, pursuant to Rule 17(b), a partnership's capacity to sue or be sued is governed by the law of the <u>forum state</u>.  Fed. R. Civ. P. 17(b)(3); *see also Katz*

*v. Live Nation, Inc.*, No. 09-3740, 2010 WL 2539686, at *4 (D.N.J. June 17, 2010) (confirming

that the law of the forum state controls the analysis under Rule 17(b)(3)(A)); *Beare v. Millington*,

No. 07-3391, 2009 WL 10706535, at *1 (E.D.N.Y. Aug. 20, 2009) (same); *Borah v. Monumental*

*Life Ins. Co.*, No. 04-3617, 2005 WL 351040, at *2 (E.D. Pa. Feb. 14, 2005) (same); *DHIP, LLC*

*v. Fifth Third Bank*, No. 19-2087, 2021 WL 4481118, at *5 (S.D.N.Y. Sept. 30, 2021) (same).

Here, while it is undisputed that New JKJ and Former JKJ are aggregate partnerships, and

under Delaware law, aggregate partnerships "cannot sue or be sued in the firm name," *see JKJ*

*Partnership 2011 LLP*, 226 A.3d at 1123, the law in New Jersey is murkier. While it appears that

under New Jersey law, "partnerships have the capacity to sue and be sued," *HB Gen. Corp. v.*

*Manchester Partners, L.P.*, No. 94-5160, 1995 WL 311351, at *2 (D.N.J. May 15, 1995), *rev'd on*

*other grounds*, 95 F.3d 1185 (3d Cir. 1996) (citing N.J. Ct. R. 4:4-4(a)(5)), no courts interpreting

New Jersey partnership law, have made a distinction between the aggregate or entity theory as it

pertains to a partnership's capacity to file suit.[7]

Notwithstanding this lack of clarity, I need not weigh in on this issue, because whether an

aggregate partnership has the capacity to sue under New Jersey law does not change the outcome.

For the exception to apply under Rule 17(b)(3)(A), courts have found that so long as a partnership,

or other unincorporated association, with no such capacity to sue or be sued in its common name

does so to assert a <u>federal claim</u>, the exception under Rule 17(b)(3)(A) applies. *See California*

*Darts Ass'n v. Zaffina*, 762 F.3d 921, 928 (9th Cir. 2014) (classifying a corporation with suspended

powers as an unincorporated association and holding that it had capacity to sue under Fed. R. Civ.

---

[7]      Neither Relator nor Defendants recognized that the law of the forum state regarding
capacity to sue and be sued controls under Rule 17(b)(3), and therefore, they do not discuss the
ability of partnerships to file suit under New Jersey law. But that is of no moment, because even
under Delaware law, the exception in Rule 17(b)(3)(A) controls and the analysis herein applies
equally.

P. 17(b)(3)(A) because it had brought federal claim under the Lanham Act); *Northpoint Tech., Ltd. v. DirecTV Grp., Inc.*, No. 09-506, 2010 WL 11444157, at *2 (W.D. Tex. Dec. 13, 2010) (holding that "even if [the plaintiff] lacks capacity to pursue this cause of action [patent infringement] under Texas law, it squarely fits within the exception afforded by Rule 17(b)(3)(A)," which "allows a partnership to enforce a federal law in federal court even if it lacks capacity to sue under state law."); *Reviv IP, LLC v. Revive Health & Wellness Stuart, LLC*, No. 19-62923, 2020 WL 4936987, at *2 (S.D. Fla. Aug. 24, 2020) (finding that although the plaintiffs could not maintain actions arising under Florida law, because they had not obtained certificates of authority from the state, "they may nevertheless pursue claims arising under federal law pursuant to Rule 17(b)(3)(A) (alongside any state supplementary claims)"); *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 628 (D.N.J. 2010) (noting that "Defendants correctly argue that [Rule] 17(b) only gives unincorporated associations the capacity to make and be subject to <u>federal claims</u>") (emphasis added).   Indeed, the purpose of the federal law exception in Rule 17(b)(3)(A) is to "prevent[ ] state law from frustrating the enforcement of federal substantive rights where state law does not grant unincorporated associations and partnerships the capacity to [sue or] be sued." *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d 71, 77 (D.D.C. 1999), *aff'd sub nom. E.E.O.C. v. St. Francis Xavier Sch.*, 254 F.3d 315 (D.C. Cir. 2000).

Moreover, it is uncontested by the parties that "the right of a relator to pursue a bounty under the *qui tam* provisions of the FCA has been characterized as a substantive right to pursue a claim for relief."   *Cunningham v. Leslie's Poolmart, Inc.*, No. 13-2122, 2013 WL 3233211, at *7 (C.D. Cal. June 25, 2013) (citing *Hughes Aircraft Co.*, 520 U.S. at 949-951); *see also United States ex rel. Robinson v. Northrop Corp.*, 824 F.Supp. 830, 837 (N.D.Ill.1993) ("The False Claims Act grants substantive rights to particular private citizens .... the plaintiffs bring this suit for themselves,

as well as for the government * * * and seek to vindicate rights that Congress gave specifically to them ... ); *O'Hara v. MortgageIT, Inc.*, No. 18-01672, 2019 WL 4645986, at *4 (D. Conn. Sept. 24, 2019) ("The False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, does provide a substantive right of action[.]").  Accordingly, because Relator asserts federal claims under the FCA, I find that even if New Jersey law -- or Delaware law -- prevents an aggregate partnership from filing suit, New JKJ and Former JKJ are proper relators based on the exception provided in Rule 17(b)(3)(A).

To the extent that Defendants rely on *Lundquist v. University of South Dakota Sanford School of Medicine*, 705 F.3d 378, 380 (8th Cir. 2013), for the proposition that Former JKJ and New JKJ are improper relators, that case is inapplicable.  In *Lundquist*, the plaintiff claimed that her former employer, the University of South Dakota Sanford School of Medicine (the "School of Medicine"), violated the Americans with Disabilities Act ("ADA") by refusing to accommodate her mental and physical disabilities and by responding to her requests for accommodation with hostile actions that caused her constructive discharge.  *Lundquist*, 705 F.3d at 379.  After the close of discovery, the district court granted the School of Medicine summary judgment on the ground that it lacked the capacity to be sued under state law and Rule 17(b).  *Id.*  On appeal, the plaintiff did not contest the district court's ruling that the School of Medicine lacks capacity to sue and be sued under South Dakota law.  Rather, she argued that her claims should not have been dismissed under Rule 17(b) because they fall within the exception set forth in Rule 17(b)(3)(A).  *Id.* at 380.  Specifically, the plaintiff argued that the University of South Dakota "partnered" with Sanford Health, a regional health-care system, in locating the School of Medicine on the campus of Sanford Hospital, and thus the School of Medicine was a partnership that may be sued in its common name to assert federal claims arising under the ADA.  *Id.*  The Eighth Circuit affirmed the district court's ruling for two reasons.  First, it found that "the School of Medicine is not, and does not hold itself

out to be, a "legal partnership" with Sanford Health, and therefore, the exception in Rule 17(b)(3)(A) cannot apply.  *Id.*  Second, the Eighth Circuit reasoned that even if the School of Medicine and Sanford Health had formed a partnership, the Rule 17(b)(3)(A) exception still would not apply because the state legislature did not deny the University and its School of Medicine the capacity to sue and be sued.  *Id.* at 380-81.  In this regard, the Eighth Circuit reasoned that "[b]y its express terms, for a federal action venued in South Dakota, the [Rule 17(b)(3)(A)] exception permits a partnership or unincorporated association 'with no ... capacity' to sue or be sued under South Dakota law to be sued in its common name in an action to enforce federal rights, such as the ADA claims [the plaintiff] asserted."  *Id.* at 380.  However, the Eighth Circuit found that because South Dakota law "did not <u>deny</u> the University and its School of Medicine the capacity to sue or be sued," but rather, "the legislature mandated that the capacity to sue or be sued resides in the Board of Regents," the Rule 17(b)(3)(A) exception could not apply.  *Id.* at 381.  Here, Defendants rely on *Lundquist* to argue that because state law permits the partners of Former JKJ and New JKJ to file suit, the Rule 17(b)(3)(A) exception does not apply.

Unlike in *Lundquist*, Former JKJ and New JKJ are clearly partnerships, and therefore, the first element of the Rule 17(b)(3)(A) exception is met.  Moreover, as explained above, under the law of the forum state, here New Jersey, it appears that Former JKJ and New JKJ have the capacity to file suit.  Assuming, however, that New Jersey law (like Delaware law) prevents aggregate partnerships from filing suit, I do not find that the mere fact that New JKJ and Former JKJ's partners might have the capacity to file suit bars the Rule 17(b)(3)(A) exception.  *See Willis v. Rock Hill Mech. Corp.*, No. 19-952, 2021 WL 4476740, at *7 (E.D. Mo. Sept. 30, 2021) ("*Lundquist* involved a state legislature mandating how a state entity had the capacity to sue and be sued.  It did not hold that all partnerships can avoid the capacity exception of Rule 17 because

the partnership's partners have the capacity to sue and be sued."). Finally, having found that New JKJ and Former JKJ are proper relators, I need not consider the Third Circuit's follow-up question regarding whether to allow amendment so that the partners can name themselves as the real realtors in interest under Rule 17(a)(3).

**B.**     **Rule 15 Deficiency**

Next, given the Court's finding that Former JKJ and New JKJ could serve as relators, the Court considers whether the SAC was properly amended under Fed. R. Civ. P. 15. Defendants argue that the SAC should not have been permitted to be filed, because New JKJ filed the SAC despite not being a party to this action. Def. Moving Br., 11-12. In response, Relator argues that Defendants did not oppose JKJ's motion for leave to file the SAC, nor did they ever move to strike or dismiss the SAC under Rule 15. Relator Opp. Br., 10-12. Essentially, as an issue of waiver, Relator claims that Defendants cannot raise this argument now, since it was available to them when they filed their prior motion to dismiss. *Id.* Also, Relator argues that New JKJ, as the legal successor-in-interest to Former JKJ, "automatically" became a party to the action, such that its filing of the SAC was proper under Rule 15. *Id.* at 11.

At the outset, the Court rejects Relator's waiver argument. Contrary to Relator's position, the record shows that Defendants did, in fact, previously raise this contention, albeit in the context of the first-to-file bar. *See* ECF No. 58-1 at 12-16. In their first motion to dismiss, Defendants argued that Dr. Gurbel's replacement of Dr. Venditto, known then only as "Partner B," created a new partnership under Delaware partnership law, and therefore, this new entity's participation in the action was barred by the Federal Rules of Civil Procedure. *Id.* Only after an appeal to the Third Circuit and confirmation from the Delaware Supreme Court that as an aggregate partnership, Former JKJ dissolved upon withdrawal of a partner, did Relator's Rule 15 deficiency become a

procedural issue, as noted by the Third Circuit.  In addition, Relator cites to no case law, nor has the Court found legal, or logical, support, to establish that compliance with Rule 15 can be waived, such that New JKJ, a non-party, can file an amended complaint.  Indeed, as discussed, *infra*, because New JKJ is a non-party, and because Former JKJ, a dissolved entity, can no longer prosecute this action under Delaware law, the Court lacks subject matter jurisdiction—a nonwaivable requirement.

Turning to Rule 15, the plain language of the rule clearly and unambiguously provides that only a **<u>party</u>** may amend the complaint.  Specifically, Rule 15 provides:

> (1) Amending as a Matter of Course.  A **<u>party</u>** may amend its pleading once as a matter of course within:
>
> > (A) 21 days after serving it, or
> >
> > (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.
>
> (2) Other Amendments.  In all other cases, a **<u>party</u>** may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a)(1)-(2) (emphasis added).  Indeed, Relator does not argue that Rule 15 is vague, nor does it argue that Rule 15 has been interpreted to permit a non-party to file an amended complaint on behalf, or in place, of a party to a suit.

After the Delaware Supreme Court weighed in, it is also clear now that New JKJ and Former JKJ are separate and distinct legal entities under Delaware partnership law; that New JKJ, not Former JKJ filed the SAC; and that New JKJ is not a party to this action.  First, when referred by the Third Circuit to determine whether a new partnership was created upon the withdrawal of

Dr. Venditto and addition of Dr. Gurbel, the Delaware Supreme Court answered the question affirmatively. *JKJ Partnership 2011 LLP*, 226 A.3d at 1132-33. Specifically, the Delaware Supreme Court found that "[t]he suggestion that the Partnership Agreement contemplates the withdrawal and substitution of new partners without causing a dissolution contradicts the plain language of Section 1.03, which states that JKJ is not a separate legal entity distinct from its partners." *Id.* (emphasis added). The Court reasoned that "JKJ was not distinct from partners A, B, and C, and that the withdrawal of B and the substitution of G changed the composition from A, B, and C to A, C, and G." *Id.* (emphasis added). As such, to the extent JKJ's Partnership Agreement "allows for the withdrawal and addition of new partners," the Delaware Court found that those provisions "conflict with Section 1.03's rule that JKJ is not distinct from its partners, and Section 1.03 controls." *Id.* Accordingly, the Delaware Supreme Court affirmed this Court's finding that "a new partnership was formed upon the replacement of Partner B with Partner G, and that the membership change effected a dissolution of the original JKJ." *Id.* at 1133. The Third Circuit bound by this finding, explained that "[w]hen one of [the partners] left the partnership and was replaced, that change amounted to forming a new partnership." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d at 230.

Moreover, with respect to timing, the Third Circuit found it undisputed that the new partner arrangement, the one which included Dr. Gurbel, prosecuted this action at the time when it filed the SAC, approximately six years after the Original Complaint. *See United States v. Sanofi-Aventis U.S. LLC*, No. 18-2472, 2019 WL 10271190, at *1 (3d Cir. June 12, 2019). Similarly, while the Delaware Supreme Court did not definitively answer whether Former JKJ survived to file the SAC, the Court noted that the SAC named the three partners to JKJ as Dr. Stahl, Evans, and Dr. Gurbel—signaling that the SAC "must have been filed by New JKJ." *JKJ Partnership 2011 LLP*, 226 A.3d

21

at 1136; *see also* SAC, ¶ 26 ("There are three JKJ partners: Paul A. Gurbel, M.D., Jeffrey A. Stahl, M.D., and Kelly D. Evans.").   Because Relator neither provides evidence, nor argument, that Former JKJ filed the SAC, the Third Circuit and Delaware Supreme Court's conclusion that the SAC must have been filed by New JKJ controls.

Finally, New JKJ is not a proper party to this action.   On appeal, the Third Circuit advised that "[i]n normal civil litigation, there are three ways for nonparties with interests relevant to a suit to become parties to a suit:" (1) they can intervene in the existing suit, (2) file their own related suits based on the same facts, or (3) they can be added to the existing suit by the court or the existing parties.   *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d at 233.   In False Claims Act *qui tam* suits, the first-to-file bar precludes the first two options, but not the third. *Id.*   In that connection, when an entity dissolves, but its purported successor-in-interest seeks to continue prosecuting the claims, substitution pursuant to Fed. R. Civ. P. 25 is the proper procedural course.   *See Redland Ins. Co. v. Aghishian*, No. 08-7492, 2011 WL 13183042, at *4 (C.D. Cal. Nov. 28, 2011) (granting a plaintiff's motion to substitute pursuant to Rule 25(c) following merger); *AFGD, Inc. v. Tri-Star Glass, Inc.*, No. 05-300, 2006 WL 8458211, at *2 (N.D. Okla. Feb. 28, 2006) (granting a plaintiff's motion to substitute pursuant to Rule 25 after merger and dissolution because the plaintiff was "no longer a viable legal entity").   Under Rule 25(c), a court may substitute or join additional parties where "an interest is transferred," a party "on motion" requests joinder or substitution, and "[t]he motion [is] served as provided in Rule 25(a)(3)." Fed. R. Civ. P. 25(c).   The Rule "presupposes that the substituted person was a party to the pending action but no longer maintains the same interest in the outcome as the substituting party.... Underlying the rule is the desire to preserve the adjudication for the real party in interest in the matter." *McMoran Oil & Gas Co. v. KN Energy, Inc.*, 907 F.2d 1022, 1025 (10th Cir. 1990), *rev'd*

*on other grounds by Freeport-McMoran, Inc. v. K N Energy, Inc.*, 498 U.S. 426 (1991); *see also Oklahoma Nat. Gas Co. v. State of Oklahoma*, 273 U.S. 257, 259 (1927) (finding that "[t]here is no specific provision in our rules for the substitution as a party litigant of a successor to a dissolved corporation. It is well settled that at common law and in the federal jurisdiction a corporation which has been dissolved is as if it did not exist, and the result of the dissolution cannot be distinguished from the death of natural person in its effect.").

Here, however, Former JKJ never petitioned the Court pursuant to Rule 25 to substitute New JKJ as the proper plaintiff, and as such, New JKJ was never made a formal party in this case. Rather, unbeknownst to the Court and Defendants, Dr. Gurbel replaced Dr. Venditto as a partner in JKJ at some point prior to the SAC being filed.  As discussed above, this change in the composition of the partnership created a new legal entity and immediately commenced the dissolution of Former JKJ, such that it was not in existence to prosecute this action or file the SAC. *See JKJ Partnership 2011 LLP*, 226 A.3d at 1136 ("We hold that the Former JKJ may not continue to prosecute the action as a part of its winding up process, because to do so would be inconsistent with Section 8.02 of the Partnership Agreement, which directs that, '[t]he liquidation of Partnership property shall be carried out as promptly as is consistent with obtaining the fair value thereof,' and because the action is in its beginning phases and is the sole purpose for which JKJ was established.").  In circumvention of the Federal Rules of Civil Procedure, however, New JKJ simply filed the SAC in place of Former JKJ, as if it was a party to this case.  New JKJ did so without properly applying to the Court for substitution or seeking Defendants' consent.

Specifically, Defendants rely on *U.S. ex rel. Little v. Triumph Gear Systems, Inc.*, 870 F.3d 1242 (10th Cir. 2017) to support their position that New JKJ never entered the suit by any of the

23

three means identified by the Third Circuit.[8]  In *Triumph*, a single relator, Blyn, filed a *qui tam* action.  870 F.3d at 1245.  Several months later, an amended complaint named two other relators, Little and Motaghed, with Blyn "excised from the caption—and the rest of the amended complaint—without explanation." *Id.* The court concluded that the new relators "didn't enter th[e] action through a Rule 15 addition" because "the right to amend lies solely with '[a] party.'" *Id.* at 1248 (quoting Fed. R. Civ. P. 15(a)(1)).  The court reasoned that "Blyn was the sole named plaintiff in the original complaint," and therefore, "Little and Motaghed, as non-parties, had no right to amend the complaint under Rule 15." *Id.*  Although this case is slightly different from *Triumph*, in that, here, the original relator was a partnership consisting of three anonymous partners, and one partner was replaced by another individual prior to the filing of the SAC, the result is the same. The replacement of Dr. Venditto created a new legal entity which did not exist at the time of the previous amended complaint, and therefore, like *Triumph*, the SAC was filed by a non-party, not the original relator.  Thus, regardless of Relator's knowledge or intent, this amendment was improper under Rule 15. *See Intown Props. Mgmt., Inc. v. Wheaton Van Lines, Inc.*, 271 F.3d 164, 169 (4th Cir. 2001) ("Rule 15 allows liberal amendment by *parties*, not non-parties....").  At bottom, I find it contrary to the purpose and spirit of the rules of civil procedure for an entirely new party to step into the shoes of a dissolved partnership plaintiff without notice to the other litigants and without approval of the Court.

---

[8]     Although the Third Circuit rejected the Tenth Circuit's "broad" interpretation of the first-to-file bar, the appellate court did not reject all aspects of the case, including the Tenth Circuit's Rule 15 analysis.  Rather, based on the questions posed by the Third Circuit, including its comment that its finding related to the first-to-file bar did not necessarily mean "[New JKJ] *is* taking part as a matter of partnership law and ordinary civil procedure," the court suggested, just as the *Triumph* Court held, that Rule 15's "party requirement" is very much an issue based on the factual circumstances presented here.

To the extent that Relator argues, without sufficient legal support, that New JKJ, as the legal successor-in-interest to Former JKJ, "automatically" became a party to the action, the Court is not persuaded by this argument. As explained above, the withdrawal and replacement of Dr. Venditto created a new partnership—a separate and distinct legal entity. Because it was a new-party entity, New JKJ was not exempt from the rules of civil procedure, and it must have requested substitution before it could seek to amend the Complaint. *See*, *e.g.*, *Queens W. Dev. Corp. v. Honeywell Int'l, Inc.*, No. 10-4876, 2013 WL 16330 at *1 (D.N.J. Jan. 15, 2013) (granting the plaintiffs' motion for leave to file an amended complaint which proposed to substitute AvalonBay Communities, Inc. for the dissolved Avalon Riverview II, LLC). Accordingly, the Court finds that because non-party New JKJ filed the SAC, that Complaint is dismissed as improperly filed.

### C.    Ownership of the Litigation Asset and Substitution Pursuant to Fed. R. Civ. P. 25

Finally, the Third Circuit questioned whether Former JKJ or New JKJ owns this lawsuit—an important question for this Court to consider in the context of Fed. R. Civ. P. 25 as it relates to substitution of New JKJ for Former JKJ. The Third Circuit noted that while Relator's appeal was pending, the partnership executed a Partnership Continuation Agreement ("PCA"), purporting to transfer the "litigation asset"; however, the appellate panel questioned whether that agreement was necessary, *i.e.*, whether the litigation asset automatically transferred or whether Former JKJ even had the power to transfer it as part of its winding-up process. In this motion, Defendants argue that the litigation asset did not automatically transfer upon the dissolution of Former JKJ and the creation of New JKJ. Def. Moving Br., 15-16. Rather, Defendants highlight that nothing in the Partnership Agreement provides for the automatic assignment or transfer of the litigation asset upon Former JKJ's dissolution, and that no evidence exists to demonstrate that Former JKJ properly transferred the litigation asset to New JKJ. *Id.* Relator, on the other hand, argues that the

25

litigation asset automatically transferred from the old partners to the new partners. Relator Opp. Br., 13-15. Relator also points to the PCA, maintaining that "all of the property of JKJ—including the action—from the original partnership to the new partnership" was transferred. *Id.* at 15. Based upon the Delaware Supreme Court's findings, I agree with Defendants' position.

Having determined that New JKJ is a nonparty, the Third Circuit's question regarding transfer of the litigation asset is directly related to New JKJ's ability to substitute under Rule 25. As it pertains to party substitution, Rule 25(c) provides that:

> [i]f an interest is transferred, the action may be transferred, the action may be continued by or against the original party, unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party. The motion must be served as provided in Rule 25(a)(3).

Fed. R. Civ. P. 25(c) (emphasis added). "Because joinder or substitution under Rule 25(c) does not ordinarily alter the substantive rights of parties but is merely a procedural device designed to facilitate the conduct of a case, a Rule 25(c) decision is generally within the district court's discretion." *Luxliner P.L. Export Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 71–72 (3d Cir. 1993). In order to determine whether an entity is a transferee of an interest that triggers Rule 25(c), and to exercise its discretion under Rule 25(c), a district court must apply the law to the facts presented in the particular case. *Id.* at 72. Thus, I find that ownership of the litigation asset would be critical to any motion to substitute pursuant to Fed. R. Civ. P. 25(c), because without such a showing, the application would likely fail.[9] *See, e.g., DVI Fin. Servs., Inc. v. Bay Area Reg'l Cancer Ctr., L.P.*,

---

[9]    I note that Rule 25(c) does not expressly "require that anything be done after an interest has been transferred." *Moroccanoil, Inc. v. Conforti*, No. 11-136, 2021 WL 2310092, at *3 (D.N.J. June 4, 2021) (quoting 7C Wright, Miller & Kane, Federal Civil Procedure § 1958 at 555 (2d ed. 1986) ("Wright & Miller")). For example, "when a defendant corporation has merged with another corporation, […] the case may be continued against the original defendant and the judgment will be binding on the successor even if the successor is not named in the lawsuit." Wright & Miller § 1958 at 555. That said, this situation is distinguishable because Former JKJ—the only proper

237 F. App'x 721, 722 (3d Cir. 2007) (affirming the district court's decision to allow substitution where the new party "possessed a transferable interest in the action by virtue of its power of attorney and its contractual obligations"); *Textron Fin.-New Jersey Inc. v. Herring Land Grp., LLC*, No. 06-2585, 2008 WL 11382024, at *1 (D.N.J. July 29, 2008), *aff'd sub nom. Textron Fin.-New Jersey, Inc. v. Herring Land Grp., LLC.*, No. 06-2585, 2008 WL 11382030 (D.N.J. Sept. 16, 2008), *and on reconsideration in part*, No. 06-2585, 2008 WL 11382032 (D.N.J. Oct. 22, 2008) (denying a plaintiff's motion to substitute where movant provided no proof of any transfer or assignment of the interests at issue); *Mars, Inc. v. JCM Am. Corp.*, No. 05-3165, 2007 WL 776786, at *2 (D.N.J. Mar. 9, 2007) (denying a plaintiff's motion to substitute in the context of patent infringement because questions of fact remained as to the extent of the proposed new party's ownership rights in the patents-in-suit following a merger); *Howell v. Phoenix Life Ins. Co.*, No. 07-014, 2009 WL 10669623, at *2 (N.D. Ga. Aug. 20, 2009) (granting a motion to substitute pursuant to Rule 25(c), in part, because the plaintiff demonstrated an assignment of all rights to any future proceeds flowing from the lawsuit to the new party).

Here, I do not find sufficient evidence exists demonstrating transfer of the litigation asset. In its in-depth opinion, the Delaware Supreme Court confirmed this Court's explanation of the unique features and nuances of aggregate partnerships under Delaware partnership law by providing a historical overview of the shift from the Delaware Uniform Partnership Act ("DUPA") to the Delaware Revised Uniform Partnership Act ("DRUPA"). *JKJ Partnership 2011 LLP*, 226 A.3d at 1123-1128. Specifically, the Court explained that the Unform Partnership Act ("UPA"), which the DUPA was modeled after, adopted the key aggregate principle of having partnerships

---

party—dissolved with the replacement of Dr. Venditto, and therefore, under Delaware partnership law, it can no longer prosecute this action. So it follows, in this scenario, transfer of the litigation asset is essential.

Case 3:11-cv-06476-FLW-TJB   Document 110   Filed 10/28/21   Page 28 of 31 PageID: 2998

be an aggregation of individuals, defining a partnership as "an association of two or more persons to carry on as co-owners a business for profit." *Id.* at 1125. Generally, under the UPA, when a partner left the partnership, the partnership dissolved. *Id.* The Delaware Supreme Court explained, however, that unlike the UPA and DUPA, the DRUPA embraced the "entity theory" of partnership, meaning that the partnership is an "entity distinct from its partners." *Id.* at 1126. According to the Delaware Supreme Court, the motivation for this shift from the aggregate theory to the entity theory as the dominant model under Delaware partnership law was to "prevent technical dissolution" and to "allay previous concerns stemming from the aggregate theory, such as the necessity of a deed to convey title from the 'old' partnership to the 'new' partnership every time there is a change of cast among the partners." *Id.* (citing Allan Donn, Robert W. Hillman & Donald J. Weidner, Revised Uniform Partnership Act Section 201 (2019–2020 ed.) at Official Cmt.). In other words, the Delaware Supreme Court advised that in an aggregate partnership, in order to transfer title of any assets, there must be a conveyance.

In this regard, the PCA is the only document in the record that Relator purports somehow conveys title to the litigation asset from Former JKJ, an aggregate partnership, to New JKJ. But, nothing in the Partnership Agreement provides for transfer of the litigation asset. Rather, quite the opposite, the Partnership Agreement states that upon dissolution, "the Partnership's business shall be liquidated in an orderly manner" and that "[t]he Partners shall determine which Partnership property shall be distributed in-kind and which Partnership property shall be liquidated." Partnership Agreement, Certification of Anand Agneshwar, Esq. ("Agneshwar Cert."), Ex. A at § 8.02. Moreover, Dr. Venditto's withdrawal notice states that the partnership has "no liabilities and no value," and thus, according to that document, there would be nothing to assign to New JKJ upon dissolution of Former JKJ. *See* JKJ Partnership 2011 LLP Notice of Withdrawal of John

28

Venditto, Agneshwar Cert., Ex. B at 2.  As to the PCA, the timing of the PCA belies Relator's position.  Specifically, the PCA was not executed until May 16, 2020—more than three years after New JKJ filed the SAC.  Moreover, the Court notes that despite purporting to transfer Dr. Venditto's interests in Former JKJ, the PCA was not signed by Dr. Venditto.  Under the Partnership Agreement, "[a]ny action taken by or on behalf of the Partnership" and any attempt to "transfer, sell, assign, encumber, or otherwise dispose of all or any portion of the Partner's Interest" requires the written consent of the Partners."  Partnership Agreement, Ex. A at §§ 5.01 and 7.01.  The Partnership Agreement defines "Partners" as Kelly Wood, Jeffrey Stahl, and John Venditto, as well as "any Person subsequently admitted as a partner in accordance with the terms of this Agreement."  *Id.* at § 1.01.  While Relator argues that Dr. Venditto's execution of the PCA was not necessary because the Partnership Agreement's requirement that "transfer . . . of all or any portion of the Partners' Interest" refers only to the "partner's interest in the partnership," not the "partnership's interest in the action," that interpretation misses the mark.  Rather, the plain language of Section 5.01, which concerns management of the partnership, clearly states that regardless of any attempt to transfer, sell, or assign a Partner's interest, "[a]ny action taken by or on behalf of the Partnership" requires the written consent of the Partners.  Thus, clearly the PCA, which endeavored to transfer the rights, title, and interest in any property belonging to Former JKJ to New JKJ, including this action, required the signature of Dr. Venditto.

Put simply, New JKJ has not adequately demonstrated ownership over this lawsuit at the time that it filed the SAC, and therefore, it cannot stand in the shoes of Former JKJ.  As explained above, the decision to substitute a party under Rule 25(c) is generally left to the district court's

discretion, and here, my findings regarding New JKJ's ownership of the litigation asset, would weigh against substitution.[10]

### D.   Dismissal of the SAC Is the Appropriate Remedy

Based upon the Court's findings herein, the SAC is dismissed as improperly filed. Defendants ask that if the Court were to dismiss the SAC, it should not revert to the Original Complaint, because, as a dissolved entity, Former JKJ cannot prosecute this action as part of winding-up of the partnership.  *Id.* at 9, 12 (citing *JKJ Partnership 2011 LLP*, 226 A.3d at 1136-37).

Here, the Court agrees with Defendants that this action cannot revert to the Original Complaint given Former JKJ's dissolution.  Indeed, the Delaware Supreme Court advised that Former JKJ should no longer be able to prosecute this action as part of its winding up process because

> to do so would be inconsistent with Section 8.02 of the Partnership Agreement, which directs that, "[t]he liquidation of Partnership property shall be carried out as promptly as is consistent with obtaining the fair value thereof," and because the action is in its beginning phases and is the sole purpose for which JKJ was established.

The Court also cannot consider the merits of the Original Complaint without a live case and controversy.  Article III requires a live case or controversy throughout the entire litigation; if no live controversy exists, the court must dismiss the case for lack of jurisdiction.  *Cobb v. Yost*, 342 F. App'x 858, 859 (3d Cir. 2009) (citing *Lusardi v. Xerox Corp.*, 975 F.2d 964, 974 (3d Cir.1992)). Here, because New JKJ is not a proper party to this action, and because Former JKJ is dissolved,

---

[10]      The Court also stresses that even if the litigation asset transferred from Former JKJ to New JKJ, which it did not, New JKJ was still a separate and distinct legal entity pursuant to Delaware partnership law, and therefore, ownership of the litigation asset, alone, would not cure New JKJ's Rule 15 deficiency.

no plaintiff exists to prosecute the action, and therefore, the Court lacks jurisdiction to consider the merits of the Original Complaint.  *See LN Mgmt., LLC v. JPMorgan Chase Bank, N.A.*, 957 F.3d 943, 952 (9th Cir. 2020) ("Absent a plaintiff with legal existence, there can be no Article III case or controversy"); *In re: 2016 Primary Election*, 836 F.3d 584, 587–88 (6th Cir. 2016) ("There is no plaintiff with standing if there is no plaintiff."); *see also Paynter v. Yannis Karavia LLC*, No. 20-09458, 2021 WL 2549316, at *2 (D.N.J. June 22, 2021) (dismissing case where the plaintiff died and no substitution occurred).

## IV.   __CONCLUSION__

For the reasons set forth above, Defendants' motion to dismiss is **GRANTED**.


Dated: October 28, 2021                                 /s/ Freda L. Wolfson
                                                        Freda L. Wolfson
                                                        U.S. Chief District Judge